## AMADEO v. ZANT

No. 87–5277.   Argued March 28, 1988—Decided May 31, 1988

MARSHALL, J., delivered the opinion for a unanimous Court.

*Stephen B. Bright* argued the cause for petitioner. With him on the brief were *Palmer Singleton, Robert L. McGlasson,* and *William M. Warner.*

*Susan V. Boleyn,* Senior Assistant Attorney General of Georgia, argued the cause for respondent. With her on the brief were *Michael J. Bowers,* Attorney General, *Marion O. Gordon,* First Assistant Attorney General, and *William B. Hill, Jr.,* Senior Assistant Attorney General.*

JUSTICE MARSHALL delivered the opinion of the Court.

In considering petitioner's motion for a writ of habeas corpus, the District Court concluded that petitioner successfully established cause for his failure to raise in the state trial court a constitutional challenge to the composition of the ju-

---

*\*Julius L. Chambers* and *Charles Stephen Ralston* filed a brief for the NAACP Legal Defense and Educational Fund, Inc., as *amicus curiae* urging reversal.

ries that indicted him, convicted him, and sentenced him to death. This case presents the question whether the factual findings upon which the District Court based its conclusion were clearly erroneous.

I

Petitioner Tony B. Amadeo was convicted of murder and criminal attempt to commit theft in November 1977 in the Superior Court of Putnam County, Georgia. The jury returned a recommendation of death for the murder charge, and the court imposed the death sentence. In addition, the court imposed a 10-year sentence for the attempted theft charge.

Nine months later, while petitioner was pursuing his direct appeal to the Georgia Supreme Court, an independent civil action in federal court brought to light a scheme by the District Attorney and the Jury Commissioners of Putnam County to underrepresent black people and women on the master jury lists from which all grand and traverse (petit) juries were drawn. See *Bailey* v. *Vining*, Civ. Action No. 76–199 MAC (MD Ga., Aug. 17, 1978). *Bailey* involved a challenge to the at-large voting procedures in Putnam County. In the course of researching the case, one of the plaintiffs' attorneys reviewed the master jury lists for a period of 20 to 30 years and uncovered a handwritten memorandum on a sheet of legal paper. The missive bore no caption or other designation, no signature, no date, and no file stamp from the court Clerk's office. Under the heading "Result," the sheet listed figures for the number of black people and women to be placed on the master jury lists that would result in their underrepresentation on grand and traverse juries by a range of 5 to 11%. App. 4. The attorney who discovered the memorandum asked the Clerk of the court where it came from, and the Clerk responded that it was instructions from the District Attorney's Office to the Jury Commissioners about the master jury lists. *Id.*, at 45. According to the

Clerk, the Jury Commissioners followed the memorandum's instructions.[1]  *Id.*, at 9.

The District Court in *Bailey* found that the memorandum was intentionally designed to underrepresent black people and women on grand and traverse juries without giving rise to a prima facie case of racial discrimination under this Court's opinion in *Swain* v. *Alabama,* 380 U. S. 202, 208–209 (1965) (underrepresentation of less than 10% is insufficient to prove intentional discrimination), and the Fifth Circuit's opinion in *Preston* v. *Mandeville,* 428 F. 2d 1392, 1393–1394 (1970) (13.3% underrepresentation constitutes prima facie case).  See App. 10, 78.  Concluding that the master jury lists could not be used for any purpose until the discrimination had been corrected, the District Court ordered the Jury Commissioners to reconstitute the lists in conformity with the Constitution.  *Bailey* v. *Vining, supra,* at 7.

Citing the District Court's order in *Bailey,* petitioner's attorneys raised a challenge to the composition of the Putnam County juries that had indicted, convicted, and sentenced petitioner in their opening brief on direct appeal to the Georgia Supreme Court.  In addition, petitioner's attorneys filed a supplemental brief devoted solely to the jury composition issue, in which they argued that the challenge had not been waived in Superior Court because they had not had any opportunity to discover the purposeful discrimination.  See App. 14–18.  The Georgia Supreme Court nevertheless affirmed petitioner's convictions and sentences, rejecting his challenge to the jury on the ground that it "comes too late."[2]

---

[1] The Jury Commissioners were able to determine the race of prospective jurors because the master jury lists were drawn from the list of registered voters in Putnam County, which was maintained on a racially segregated basis.  See *Bailey* v. *Vining,* Civ. Action No. 76–199 MAC (MD Ga., Aug. 17, 1978), p. 9.

[2] Georgia law requires that a known challenge to the composition of the grand jury be raised before indictment, see *Sanders* v. *State,* 235 Ga. 425, 425–426, 219 S. E. 2d 768, 771 (1975), and that a challenge to the compo-

*Amadeo* v. *State*, 243 Ga. 627, 629, 255 S. E. 2d 718, 720, cert. denied, 444 U. S. 974 (1979). Petitioner twice sought a writ of habeas corpus in the state courts without success, and this Court denied certiorari both times.

After exhausting his state remedies, petitioner sought a writ of habeas corpus in Federal District Court. Petitioner's habeas petition was heard by the same District Judge who had decided the *Bailey* case. The court noted that *Bailey* established that the Putnam County Jury Commissioners had composed the master jury lists so as deliberately to under-represent black citizens without giving rise to a prima facie case of intentional discrimination. App. 78. Accordingly, the court concluded that "[c]learly, petitioner was indicted, tried and sentenced by unconstitutionally composed juries." *Ibid.* The court went on to explain that in light of the Georgia Supreme Court's finding of waiver under state law, petitioner could assert his constitutional claim in the federal habeas proceeding only if he established cause and prejudice within the meaning of this Court's decision in *Francis* v. *Henderson*, 425 U. S. 536, 542 (1976). Observing that petitioner's lawyers had raised the discrimination claim as soon as the inculpatory evidence came to light, the court found that they had engaged in no "'sandbagging'" or "deliberate bypass"—the principal concerns behind the cause and prejudice requirement. Concluding that to overlook the intentional discrimination in this case would result in a "miscarriage of justice," the District Court found sufficient cause and prejudice to excuse the procedural default and granted the writ on the basis of petitioner's constitutional challenge. App. 80.

The Court of Appeals for the Eleventh Circuit remanded the case for an evidentiary hearing. *Amadeo* v. *Kemp*, 773 F. 2d 1141 (1985). Acknowledging that neither party had requested a hearing before the District Court, the Court of

sition of the traverse jury be raised before *voir dire* commences, see *Spencer* v. *Kemp*, 781 F. 2d 1458, 1463–1464 (CA11 1986) (en banc).

Appeals nonetheless found the record insufficiently developed for proper review of the question of cause.[3] *Id.*, at 1145. The Court of Appeals requested that the District Court establish on remand "[t]he specifics of the alleged unconstitutional method of selecting the jurors and whether this method was so devious and hidden as to be nondiscoverable." *Ibid.*

On remand, the District Court held an evidentiary hearing at which it received testimony from petitioner's two trial lawyers, a lawyer who assisted petitioner's lawyers in developing the jury challenge on direct appeal, and the lawyer who discovered the memorandum in the *Bailey* case. At the conclusion of the hearing, the judge issued an oral order and memorandum opinion in which he reaffirmed his earlier conclusion that petitioner had demonstrated adequate cause to excuse his procedural default. App. 90–93. The court observed that the District Attorney had made no attempt to deal honestly with petitioner's lawyers and reveal that he had guided the Jury Commissioners' manipulation of the jury lists. *Id.*, at 92. The court concluded that, in light of all the circumstances of the case, "it was reasonable for [petitioner's lawyers] at the time that they were appointed, to not challenge the list," *ibid.*, adding, "I don't think it was a deliberate by-pass in any sense." *Id.*, at 93. The court specifically found that if petitioner's lawyers had known of the District Attorney's memorandum, they would have challenged the composition of the jury. *Id.*, at 92.

A divided panel of the Eleventh Circuit reversed. *Amadeo v. Kemp*, 816 F. 2d 1502 (1987). The court noted that the District Court had found that the racial disparity on the jury lists was concealed by county officials, *id.*, at 1507, but the court stated simply that it "disagree[d] with that conclusion." *Ibid.* The court found instead that "[t]he memorandum de-

---

[3] Noting that the State apparently had conceded that the Putnam County jury selection procedures were unconstitutional, the Court of Appeals found the prejudice requirement to be satisfied. 773 F. 2d, at 1145, n. 6.

tailing the county's efforts to alter the racial composition of the master jury lists . . . was readily discoverable in the county's public records" and that petitioner's lawyers "would have found the memorandum" had they examined the records. *Ibid.* The court further found that petitioner's lawyers had "made a considered tactical decision not to mount a jury challenge because they wanted to preserve an advantageous jury venire," *ibid.*, although the court acknowledged that there had been conflicting testimony at the evidentiary hearing on this point. *Id.*, at 1507, n. 9. In light of these findings, the court concluded that petitioner had not established cause for his failure to raise his constitutional challenge in accordance with Georgia procedural law.

The dissenting judge argued as a threshold matter that the majority ignored its obligation to defer to the trial court's factual findings unless they are clearly erroneous. *Id.*, at 1508, 1510, 1511. More broadly, the dissent maintained that "[w]here the state's efforts to conceal its misconduct cause an issue to be ignored at trial, the state should not be allowed to rely on its procedural default rules to preclude federal habeas review." *Id.*, at 1513.

We granted certiorari, 484 U. S. 912 (1987), and we now reverse.

## II

In *Wainwright* v. *Sykes,* 433 U. S. 72 (1977), this Court adopted the "cause and prejudice" requirement of *Francis* v. *Henderson, supra,* for all petitioners seeking federal habeas relief on constitutional claims defaulted in state court. The *Sykes* Court did not elaborate upon this requirement, but rather left open "for resolution in future decisions the precise definition of the 'cause'-and-'prejudice' standard." 433 U. S., at 87. Although more recent decisions likewise have not attempted to establish conclusively the contours of the standard, they offer some helpful guidance on the question of cause. In *Reed* v. *Ross,* 468 U. S. 1 (1984), the Court explained that although a "tactical" or "intentional" decision

to forgo a procedural opportunity normally cannot constitute cause, *id.*, at 13–14, "the failure of counsel to raise a constitutional issue reasonably unknown to him is one situation in which the [cause] requirement is met." *Id.*, at 14. The Court later elaborated upon *Ross* and stated that "the existence of cause for a procedural default must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule." *Murray* v. *Carrier*, 477 U. S. 478, 488 (1986). We explained that "a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials' made compliance impracticable, would constitute cause under this standard." *Ibid.* (citations omitted).

The Court of Appeals did not contest, nor could it, that the facts found by the District Court in this case permitted the District Court's legal conclusion that petitioner had established cause for his procedural default. If the District Attorney's memorandum was not reasonably discoverable because it was concealed by Putnam County officials, and if that concealment, rather than tactical considerations, was the reason for the failure of petitioner's lawyers to raise the jury challenge in the trial court, then petitioner established ample cause to excuse his procedural default under this Court's precedents. The situation described by the District Court fits squarely, indeed almost verbatim, within our holdings in *Ross* and *Carrier*. First, the District Court essentially found that the basis for petitioner's claim was "reasonably unknown" to petitioner's lawyers, *Reed* v. *Ross, supra*, at 14, because of the "objective factor" of "'some interference by officials.'" *Murray* v. *Carrier, supra*, at 488 (citation omitted). Second, the District Court's finding of no deliberate bypass amounted to a conclusion that petitioner's lawyers did not make a "tactical" or "intentional" decision to forgo the jury challenge. *Reed* v. *Ross, supra*, at 13–14.

Hence, the Court of Appeals offered factual rather than legal grounds for its reversal of the District Court's order, concluding that neither of the two factual predicates for the District Court's legal conclusion was adequately supported by the record. The Court of Appeals never identified the standard of review that it applied to the District Court's factual findings. It is well settled, however, that a federal appellate court may set aside a trial court's findings of fact only if they are "clearly erroneous," and that it must give "due regard . . . to the opportunity of the trial court to judge of the credibility of the witnesses." Fed. Rule Civ. Proc. 52(a); see *Anderson* v. *Bessemer City*, 470 U. S. 564, 573–576 (1985) (describing clearly-erroneous review generally); *Wade* v. *Mayo*, 334 U. S. 672, 683–684 (1948) (applying clearly-erroneous review in federal habeas proceeding). We have stressed that the clearly-erroneous standard of review is a deferential one, explaining that "[i]f the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Anderson* v. *Bessemer City, supra,* at 573–574. After considering the "record viewed in its entirety" in the instant case, we conclude that the Court of Appeals failed properly to apply this standard.

A

The first factual finding rejected by the Court of Appeals is the District Court's conclusion that the District Attorney's memorandum was concealed by county officials and therefore was not reasonably available to petitioner's lawyers. The Court of Appeals acknowledged that the District Court had found these facts. See 816 F. 2d, at 1507. But without examining the record or discussing its obligations under Rule 52(a), the court simply expressed disagreement and substituted its own factual findings for those of the District Court. See *ibid.* (finding that the memorandum was "not concealed,"

but rather "was readily discoverable in the county's public records").

Even assuming, somewhat generously, that the Court of Appeals recognized and applied the appropriate standard of review, we cannot agree that the District Court's factual findings were clearly erroneous. The District Court's finding of concealment is supported by the nature of the memorandum itself, which was part of the documentary record before the court. See App. 44. The District Attorney's memorandum was handwritten, unsigned, unstamped, and undesignated—physical characteristics that strongly belie the notion that the document was intended for public consumption. Moreover, the attorney who originally discovered the memorandum testified that he did so as part of a sweeping investigation of 20 to 30 years' worth of jury lists. *Id.*, at 42. He further testified that the memorandum was "not on the first page of the materials that I was perusing but somewhere within the stack of materials that [the court Clerk] gave me." *Id.*, at 44. This testimony was not disputed, and the District Court permissibly could have concluded that the memorandum was discovered by mere fortuity and that it would not have been "readily discoverable" had petitioner's attorneys investigated the jury lists that were relevant to petitioner's trial. Indeed, the Court of Appeals identified no evidence in the record—aside from the fact that the memorandum eventually was discovered—that contradicted the District Court's conclusions about the concealment and availability of the memorandum. The Court of Appeals therefore should not have set aside as clearly erroneous the District Court's findings on these matters.

## B

The second factual finding rejected by the Court of Appeals is the District Court's conclusion that petitioner's lawyers did not deliberately bypass the jury challenge. Here the Court of Appeals drew more heavily upon the record

below, citing testimony from the evidentiary hearing in the District Court to the effect that petitioner's lawyers considered a jury challenge, thought they could win it, but decided not to bring the challenge because they were pleased with the jury ultimately empaneled. See 816 F. 2d, at 1506. The Court of Appeals emphasized that petitioner is a white man with a history of assaulting black people and that petitioner's lawyers therefore were not eager to have more black people on the jury. *Ibid.* The court also cited testimony from the lawyers that they were satisfied with the jury venire because it contained several members of a charismatic religious group that had seemed sympathetic to petitioner. *Ibid.* Most damaging to petitioner's case on habeas was the court's reliance on the statement of one of his lawyers that "'we made a tactical decision, a knowing, tactical decision not to challenge the array.'" *Ibid.*, quoting 2 Record 13, App. 23.

In the face of this potent testimony from petitioner's trial lawyers, petitioner argues that even if the lawyers did consider and deliberately bypass a jury challenge, the challenge that they bypassed was not the same challenge that is now being pressed, because the only argument available at the time of trial was a statistical challenge rather than a challenge based on direct evidence of intentional discrimination. The dissenting Circuit Judge also advanced this argument. 816 F. 2d, at 1510–1511 (Clark, J., dissenting). In the alternative, petitioner argues that the District Court's finding of no deliberate bypass was supported by other testimony and evidence in the record and thus should not have been set aside by the Court of Appeals.

It is not necessary to address the merits of petitioner's first argument, because we agree that the District Court's conclusion that petitioner's lawyers did not deliberately bypass the jury challenge was not clearly erroneous. Although there is significant evidence in the record to support the findings of fact favored by the Court of Appeals, there is also significant evidence in the record to support the District Court's con-

trary conclusion, as we describe in more detail below. We frequently have emphasized that "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson* v. *Bessemer City*, 470 U. S., at 574, citing *United States* v. *Yellow Cab Co.*, 338 U. S. 338, 342 (1949), and *Inwood Laboratories, Inc.* v. *Ives Laboratories, Inc.*, 456 U. S. 844 (1982). We reaffirm that stricture today.

First, the District Court reasonably could have concluded that the lawyers' statements that they considered but ultimately rejected a jury challenge simply were not credible. Petitioner's trial lawyers, who were no longer representing him when they testified at the evidentiary hearing, had significant incentive to insist that they had considered every possible angle: they had lost a capital murder trial, and another lawyer had uncovered evidence of serious constitutional error in the proceedings. Moreover, the lawyers' statements that they thought they could win a jury challenge if they brought it are open to serious doubt. For one thing, the lawyers were quite wrong that they could have won a jury challenge; the underrepresentation of blacks and women on the master jury lists was engineered precisely to avoid a successful statistical challenge. Absent the "smoking gun" of the memorandum or some other direct evidence of discrimination, a statistical challenge would have certainly failed. In addition, the lawyers, when pressed, could offer no explanation for why they thought they could win such a jury challenge.[4] Thus, it was reasonable for the District

---

[4] See App. 28:

"THE COURT: But I mean what led you to believe you would win if you challenged [the jury] . . . ?

"WITNESS PRIOR: I can't answer that; I think we just had a general knowledge that it probably wasn't statistically right and I don't know—I don't think we had any investigation to back that up."

See also *id.*, at 39 (witness Lambert offering no specific answer to the same question).

Court to reject the lawyers' testimony and conclude that "ignorance" of the strength of the jury challenge—rather than strategy—was the true reason for the lawyers' failure to raise the claim at trial. App. 93.

Second, the District Court's refusal to credit the testimony of petitioner's lawyers was supported by the directly contradictory testimony of two other witnesses. Christopher Coates, the lawyer who discovered the memorandum in the *Bailey* case, testified that when he told E. R. Lambert, one of petitioner's lawyers, about the memorandum and the result in the *Bailey* case, Lambert said: "'Well, we did not know that . . . I wish that we had known it because we were looking for every issue to raise because it was a serious case.'" App. 47. In addition, C. Nelson Jarnagin, a lawyer who assisted Lambert on appeal, testified that Lambert told him: "'If I'd known about this jury issue prior to trial, I would've raised it.'" *Id.*, at 59–60. It was within the District Court's discretion as factfinder to credit these statements over the potentially self-interested testimony of petitioner's lawyers.[5] See *Anderson* v. *Bessemer City, supra,* at 575 (stressing the special deference accorded determinations regarding the credibility of witnesses). Indeed, the Court of Appeals even noted the conflict in the testimony before the District Court, see 816 F. 2d, at 1507, n. 9, and its failure to defer to the District Court's findings in light of this recognition is difficult to fathom.

Finally, the District Court's conclusion that petitioner's lawyers did not deliberately bypass the jury challenge was supported by events contemporaneous with the jury selection process. Petitioner's lawyers filed pretrial motions for a

---

[5] To be sure, the testimony of these two witnesses was hearsay, and Jarnagin's statement was prompted by a leading question on redirect examination. Nonetheless, no objection to either statement was made at the hearing, and the State does not argue that the District Court's admission of the statements was "plain error" under Federal Rule of Evidence 103(d).

change of venue and for a continuance to the next term of Superior Court, both of which, if granted, would have resulted in an entirely different jury venire. See App. 61–65. Both motions cited juror prejudice and claimed that a fair trial was not possible in Putnam County at that time. The District Court permissibly could have concluded that these motions and sworn statements undercut the lawyers' statements that they were completely satisfied with the jury venire they had drawn. Indeed, the District Court might well have considered this evidence more persuasive than the after-the-fact assessments of petitioner's lawyers or the other witnesses.

To be sure, the District Court could have been more precise about the bases for its factual conclusions. Indeed, had the District Court identified the record evidence that supported its findings or made clear that it was relying upon credibility determinations, the Court of Appeals might have deferred to its factual findings without dispute. The District Court's lack of precision, however, is no excuse for the Court of Appeals to ignore the dictates of Rule 52(a) and engage in impermissible appellate factfinding. See *Icicle Seafoods, Inc.* v. *Worthington*, 475 U. S. 709, 712–715 (1986). Because there is sufficient evidence in the record considered in its entirety to support the District Court's factual findings, the Court of Appeals should not have set them aside. Respondent does not dispute that those factual findings are sufficient as a matter of law to support a finding of cause.[6] The Court

---

[6] Respondent seems to argue, however, that even if cause is found to be established, petitioner suffered no cognizable prejudice. See Tr. of Oral Arg. 57–58. This argument is irreconcilable with respondent's predecessor's failure to dispute in either the District Court or the Court of Appeals that the finding in *Bailey* of intentional racial discrimination in the composition of the master jury lists satisfies the requirement of prejudice. See 2 Record 67; *Amadeo* v. *Kemp*, 773 F. 2d, at 1145, n. 6. Having conceded this point in both courts below, respondent will not be heard to dispute it here. See *Washington* v. *Yakima Indian Nation*, 439 U. S. 463, 476, n. 20 (1979) (alternative ground for affirmance must be properly raised below).

of Appeals thus erred in holding petitioner's jury challenge to be procedurally barred from federal habeas review. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for proceedings consistent with this opinion.

*It is so ordered.*